**Ashley R. Cadotte, OSB #122926**
ashley@ashleycadottelaw.com
2905 NE Broadway Street
Portland, Oregon 97232
Telephone: (971) 804-0898

**Sean J. Riddell, OSB #013943**
sjr@seanjriddellpc.com
2905 NE Broadway Street
Portland, Oregon 97232
Telephone: (971) 219-8453
**Of Attorneys for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### Portland Division

| | |
|---|---|
| NATHANIEL DAVIS JR., an individual,<br><br>Plaintiff,<br><br>vs.<br><br>SAFEWAY, INC., a Delaware corporation,<br><br>Defendant. | Case No.: 3:24-cv-00455-AB<br><br>DECLARATION OF SEAN J RIDDELL IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

I, Sean J. Riddell, do hereby depose and say:

1.      I am over the age of 18 years and am a citizen of the United States. I am licensed to

practice law in Oregon and Washington. I have personal knowledge of the facts set forth

herein and am competent to testify to them at trial.

2.      Attached and labeled as follows are true and correct copies of documents marked as

exhibits which are offered in support of plaintiff's opposition to defendant's motion for

summary judgment. The exhibits are true and correct copies of documents, produced in

form discovery herein:

| PLAINTIFF's EXHIBITS | DESCRIPTION |
|---|---|
| 4 | Mr. Grail's Facebook Profile |
| 5 | American Straight White Male interracial violent crime incidents posts |
| 6 | American Straight White Male white privilege post |

3.    Attached and labeled as follows are true and correct copies of excerpts from depositions

taken in this case, and which are offered in support of plaintiff's opposition to defendant's

motion for summary judgment.

| DEPONENT | PAGES |
|---|---|
| Ashley Cutlip | 47: 8-17 |
| Nathaniel Davis | 33: 3-7<br>74: 9 – 23<br>75: 2 – 24<br>79:14 – 80:16<br>81: l6 – 82:12<br>87:1 – 21<br>92:2 – 93:2 |
| Rick Edmunds | 25:6 - 27:15<br>26:16 – 27:14 |
| Christopher Grail | 25:20 – 11<br>25:20 to 26:11<br>26:12 – 27:8<br>50:21 – 52:3<br>57:12 – 58:17<br>58:1 – 13<br>66:22 – 67:2 and Ex. 4<br>68:12 – 15 and Ex. 4<br>68:25 – 69:12 and Ex. 5<br>70:24 – 71:22 and Ex. 6 |
| Joshua Hilfiker | 10:14 – 11:15<br>14:19 – 15:3<br>17:24 – 18:11 |

| Shena Wheeler | 11:15 -19 |
| | 18:15 – 19:7 |
| | 19:8 – 14 |
| | 20:4 – 21:8 |
| | 21:6 – 8 |

**I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.**

Dated this 12th day of November 2025.

<u>/s/ Sean J. Riddell</u>
Sean Riddell













1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3    NATHANIAL DAVIS JR.,              )
                                       )
4                 Plaintiff,           )
                                       )
5         v.                           )   Case No.
                                       )   3:24-cv-00455
6    SAFEWAY, INC., a Delaware         )
     corporation,                      )
7                                      )
                  Defendant.           )

8

9

10         DEPOSITION OF ASHLEY LEANN CUTLIP

11           Taken on Behalf of Plaintiff

12                     * * *

13

14       BE IT REMEMBERED THAT, pursuant to the Federal

15   Rules of Civil Procedure, the deposition of Ashley

16   Leann Cutlip, was taken before Bailey K. Fierling, a

17   Certified Shorthand Reporter, on Tuesday, the 19th

18   day of November, 2024, commencing at the hour of

19   9:00 a.m., in the law offices of Hitt Hiller Monfils

20   Williams, 411 SW 2nd Ave, Suite 400, Portland,

21   Oregon.

22                     * * *

23

24

25

```
 1                        APPEARANCES

 2


 3   ASHLEY CADOTTE LAW
          BY MS. ASHLEY CADOTTE
 4        2905 NE Broadway St
          Portland, OR 97232
 5        971-804-0898
          Ashley@ashleycadottelaw.com
 6        Attorney for Plaintiff;

 7   SEAN RIDDELL, ATTORNEY AT LAW
          BY MR. SEAN J. RIDDELL
 8        2905 NE Broadway St
          Portland, OR 97232
 9        971-219-8453
          sjr@seanjriddellpc.com
10        Attorney for Plaintiff;

11   HITT HILLER MONFILS WILLIAMS
          BY MR. JAMES L. HILLER
12        411 SW 2nd Ave,
          Suite 400
13        Portland, OR 97204
          503-228-8870
14        jhiller@hittandhiller.com
          Attorney for Defendant.

15

16

17

18

19

20

21

22

23

24

25
```

1  process and the procedures and the policies back

2  then.  I've learned a lot more now.

3       Q.   What would you have done different?

4       A.   I wouldn't have approached him.

5       Q.   Okay.  So after he responded to you, is it   09:56:29

6  your recollection that you did not have any further

7  contact with him?

8       A.   No.  I did.  I said to him -- I was

9  shocked.  I really was scared.  And I said that he

10 was -- he was still talking.  I don't remember        09:56:52

11 exactly what he said, but I said, no, you just

12 pulled the race card on me.  I don't know why.  I

13 was scared.  Like, I was scared.  He pulled the race

14 card on me.  I went like that and I just walked

15 away.  That was literally our interactions.  That     09:57:07

16 was literally it.  And then Chris was there and he

17 took care of the rest of it.  I don't know.  Like...

18      Q.   Okay.  Can you explain what you were

19 scared of?

20      A.   The -- just him saying it.  The shock of    09:57:18

21 him saying that.  Just the shock of that.

22      Q.   Saying what exactly?

23      A.   What he said.

24      Q.   Well, we have two separate things you've

25 said.  I'm trying to follow when you got scared and   09:57:32

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF OREGON

3   NATHANIAL DAVIS JR.,            )
                                    )
4                Plaintiff,         )
                                    )
5       v.                          )   Case No.
                                    )   3:24-cv-00455
6   SAFEWAY, INC., a Delaware       )
    corporation,                    )
7                                   )
                 Defendant.         )
8

9

10         VIDEO-RECORDED DEPOSITION OF

11             NATHANIEL DAVIS, JR.

12         Taken on Behalf of Defendant

13                    * * *

14

15      BE IT REMEMBERED THAT, pursuant to the Federal

16  Rules of Civil Procedure, the deposition of

17  Nathaniel Davis, Jr., was taken before Bailey K.

18  Fierling, a Certified Shorthand Reporter, on

19  Tuesday, the 12th day of November, 2024, commencing

20  at the hour of 9:00 a.m., in the law offices of Sean

21  Riddell, Attorney at Law, 2905 NE Broadway St.,

22  Portland, Oregon.

23                    * * *

24

25

```
 1                   APPEARANCES

 2   SEAN RIDDELL, ATTORNEY AT LAW
          BY MR. SEAN J. RIDDELL
 3        2905 NE Broadway St
          Portland, OR 97232
 4        971-219-8453
          sjr@seanjriddellpc.com
 5        Attorney for Plaintiff;

 6   ASHLEY CADOTTE LAW
          BY MS. ASHLEY CADOTTE
 7        2905 NE Broadway St
          Portland, OR 97232
 8        971-804-0898
          Ashley@ashleycadottelaw.com
 9        Attorney for Plaintiff;

10   HITT HILLER MONFILS WILLIAMS
          BY MR. JAMES L. HILLER
11        411 SW 2nd Ave,
          Suite 400
12        Portland, OR 97204
          503-228-8870
13        jhiller@hittandhiller.com
          Attorney for Defendant.

14
     Alice Austin, Videographer
15

16

17

18

19

20

21

22

23

24

25
```

 1    just working too much, watching people pass.  I

 2    needed to take a step back and just...

 3         Q.   All right.  So currently, you have a

 4    full-time job with the Forest Grove School District.

 5    True?                                              09:39:51

 6         A.   Yes.

 7         Q.   And that's 40 hours a week?

 8         A.   36.

 9         Q.   And you're currently working also for

10    AbleLight.  How many hours a week roughly is that,   09:40:02

11    or does it vary?

12         A.   36.

13         Q.   So you're currently working, if I'm

14    getting this right, 72 hours a week?

15         A.   Yeah.                                     09:40:19

16         Q.   All right.  I just want -- that's a lot of

17    hours for most people.  I'm not saying it's good,

18    bad, or indifferent.  I just want to make sure I'm

19    getting it right.  All right.  So what kind of hours

20    are you working at the school district?             09:40:30

21         A.   Right now?

22         Q.   Yeah.  I mean, from what time of day, is

23    what I'm getting at.

24         A.   Currently, like, this time right now, I

25    called out from work.  But I usually work from 7:30   09:40:39

1    incident, you were using Instacart; is that right?

2        A.    My wife was.

3        Q.    Okay.  Have you ever personally used it?

4        A.    No.

5        Q.    Okay.  I haven't either, so maybe this          10:42:43

6    will be the blind leading the blind.  Because I was

7    going to ask you a few questions.  Do you know how

8    that app even works?

9        A.    No.  I leave it to my wife.  We -- no.

10       Q.    Okay.  But what had happened is your wife      10:42:55

11   had ordered some groceries through Instacart and

12   some grocery items were delivered from the Safeway

13   store.  That's your understanding; correct?

14                   MR. RIDDELL:  Object to form.

15                   You can answer.                           10:43:19

16       A.    I know they were ordered.  I don't -- I

17   don't know how they were delivered.  I was at work

18   that day.

19       Q.    BY MR. HILLER:  Okay.  This would have

20   been on the 10th of January; correct?  The day        10:43:30

21   before.  So the incident was January 11th, and my

22   understanding is the groceries were delivered the

23   day before.  Am I wrong?

24       A.    The -- the -- I believe it was delivered

25   48 hours before.  It was during the snow and we        10:43:49

```
 1   couldn't get there until Wednesday.
 2        Q.   Okay.  Okay.  I didn't realize there was a
 3   snow issue.  Okay.  So they might -- it was either
 4   delivered on the 10th or maybe even on the 9th, I
 5   think is what you're telling me?                          10:44:09
 6        A.   Yes.
 7        Q.   Okay.  And it was chicken in particular
 8   that was an issue?
 9        A.   Yes.
10        Q.   And I think I saw somewhere, but maybe I'm   10:44:22
11   wrong, that you were upset about the price?
12        A.   Yes.
13        Q.   Or it was the quality or was it both?
14        A.   The price.
15        Q.   Okay.  Too expensive, I assume?              10:44:37
16        A.   Yes.
17        Q.   Okay.  And you -- the other -- there were
18   any number of any other items or do you know?
19        A.   I believe so.
20        Q.   And those were fine.  True?                  10:45:02
21        A.   No.
22        Q.   What was wrong with the other items?
23        A.   I don't remember.  I just know things were
24   overly priced.
25        Q.   Okay.  You think everything was overly       10:45:11
```

1   I looked it up.  Sunset was at 4:48 that day.  Do

2   you remember driving to the Safeway in the dark or

3   do you remember?

4          A.   I don't remember.

5          Q.   Okay.  All right.  You arrived, and if I'm    10:59:55

6   remembering the video correctly, you had -- the

7   chicken was in a bag?

8          A.   Yes.

9          Q.   And did I understand you to say there was

10  other items in that bag or was it just the chicken?    11:00:19

11         A.   I believe so.  Yes.

12         Q.   Just the chicken?

13         A.   No.  Other items.

14         Q.   All right.  Now, when you got there and

15  went -- you remember -- do you remember entering the   11:00:34

16  store?

17         A.   Yes.

18         Q.   And did you know where the service desk

19  was?

20         A.   I believe so.                                11:00:45

21         Q.   And did you go directly to the service

22  desk?

23         A.   I think so.

24         Q.   All right.  And you initially encountered

25  a male Safeway employee; right?                         11:00:59

```
 1        A.   Yes.

 2        Q.   Now, you probably don't know this, but his

 3   name is Chris Gail [verbatim.]  That's probably the

 4   first time you've heard that name?

 5                  MR. RIDDELL:  Object to form.            11:01:13

 6   Attorney-client privilege.

 7                  Don't answer.

 8                  (Instruction not to answer.)

 9        Q.   BY MR. HILLER:  All right.  Chris Gail was

10   the male employee.  And while we're at it, might as    11:01:21

11   well tell you.  And the female employee was an

12   Ashley Cutlip.  Okay.  So I may refer to them by

13   their names.  That's why -- that's why I just

14   mentioned them.  So initially you are dealing just

15   with the male employee, Chris Gail.  True?            11:01:47

16        A.   Yes.

17        Q.   Okay.  And was he starting to try to get

18   you a refund?

19        A.   Yes.

20        Q.   Okay.  And so for the minute or so that     11:01:59

21   you were just dealing with him, nothing unusual

22   happened?

23        A.   Yeah.

24        Q.   Okay.  And then Ms. Cutlip arrived; right?

25        A.   Yes.                                         11:02:22
```

1    Q.    If I understand it, she confused you with

2    another customer, and thought that you had been told

3    that you were not allowed in the store?

4    A.    No.

5    Q.    Okay.                                          11:02:41

6    A.    She identified specifically to me that I

7    was 86ed from the store.  Going to reference back to

8    the camera footage, she pointed straight at me and

9    told me I was 86ed from the store.

10    Q.    Did you know what that even meant?            11:02:59

11    A.    I knew was 86ed meant.  Yes.

12    Q.    Okay.  All right.  How did you respond to

13    that?

14    A.    I was shocked.  I said I'm sorry.  You

15    have me mistaken.                                   11:03:17

16    Q.    Okay.  And then what?

17    A.    We begin to have reaction communication.

18    I identified to her that, I'm sorry, you have me

19    mistaken.  All Black people don't look the same.  I

20    told her that.  She threw her hands up in the air,  11:03:33

21    said I was playing the race card.  The whole

22    conversation amongst, me, her, and Chris started

23    going south.  We just started having reaction

24    communication.  Being told if I don't exit, they're

25    going to call the police.  Chris looks through --    11:03:52

1    Q.   Wait.  Wait.  Stop right there.  They said

2    what?

3    A.   I'm being told if I don't exit, they're

4    going to call the police.

5    Q.   If you don't leave the store?              11:04:01

6    A.   Yes.

7    Q.   Who -- do you remember which of the two

8    said that to you?

9    A.   I believe it was Ashley.

10   Q.   Okay.  Now, I've seen the video.  And then  11:04:07

11   within a minute or so she leaves.  Is that your

12   recollection?

13              MR. RIDDELL:  Object to form.

14              You may answer, if you can.

15   A.   Can you repeat that?                        11:04:22

16   Q.   BY MR. HILLER:  I looked at the video

17   yesterday.

18   A.   Okay.

19   Q.   There's interactions between the two of

20   you for about one minute, and then she left.  I'm  11:04:33

21   going to represent to you that that's what the video

22   shows.  I don't know if you remember that when you

23   looked at the video.  Do you remember that?

24              MR. RIDDELL:  Object to the compound

25   question.  Object to form.  Object to your          11:04:48

1      A.   Gail.  He looked through the book.  He

2  identified that there wasn't no communication

3  amongst individuals that I called yesterday, so no

4  notes were taken.  He had no -- no idea.  His

5  communication kind of became reaction, because he          11:10:13

6  kept telling me I was playing the race card.  He

7  repeated that to me, like, three times.  I was

8  playing the race card.  He told me he was no longer

9  helping me because I was playing the race card.

10  Ashley came over and said something again.  I          11:10:28

11  stepped back.  I observed students looking at me

12  from my school.  I had a coworker walk by and ask me

13  what was going on.  I had a man chuckling at me in

14  line because I'm playing the race card.  Took a step

15  back.  I contacted my wife to make her aware of what          11:10:46

16  was going on because I was in a stressful situation.

17  And then I stepped back up to the counter, attempt,

18  one more time, to return my things, but I was told

19  no, since I'm playing the race card, they put my

20  things back in the bag behind them and told me to          11:11:05

21  come back tomorrow when this other manager is there.

22      Q.   Okay.  So would you agree that for at

23  least some time, Mr. Gail was attempting to get you

24  a refund?

25      A.   He wasn't never attempting to help me.          11:11:18

1   person.

2       Q.   Okay.  All right.  Let's talk about the

3   January 12 complaint to Safeway.  That's the

4   following day, right, you made a complaint over the

5   phone.  True?                                      11:16:39

6       A.   Yes.

7       Q.   Okay.  How did you get the number to make

8   the complaint?

9       A.   Google.

10      Q.   All right.  Were you talking with someone   11:16:48

11  at the store, at corporate, or do you know?

12      A.   Both.

13      Q.   All right.  Store first, corporate second?

14  How did that work?

15      A.   I believe I contacted corporate.  They      11:16:59

16  identified the contact at the store.

17      Q.   Okay.  And you spoke to Joyce?

18      A.   I believe so.

19      Q.   Okay.  You don't have a last name, do you?

20      A.   No.                                          11:17:12

21      Q.   And what did she say to you?

22      A.   I explained everything.  She told me she

23  would call, contact me back.  I was -- we

24  were -- came into contact later on in the afternoon

25  when I got off work.  She identified that I can come  11:17:28

1  in and refund my items, that they will give me,

2  like, a $25 gift card for my trouble.

3      Q.   Did you ever go back to the Safeway?

4      A.   No.  I have not been in there since that

5  incident.                                          11:17:48

6      Q.   Okay.  So you never did get the refund?

7      A.   No.  I just decided to cook the food and

8  whatever.

9      Q.   Okay.  You actually did eat the chicken at

10 one point or another?                              11:18:03

11     A.   I think my kids ate it.  I don't know.

12     Q.   Okay.  All right.  Now, you said some

13 people witnessed the accident.  Not the accident.

14 Incident.  And I -- I think I've seen some names,

15 and there was even a tape recording of an interview  11:18:24

16 with a -- let me get the names here.

17              MR. HILLER:  Off the record for a

18 second.

19              THE VIDEOGRAPHER:  We are going off

20 the record at 11:18 a.m.                            11:18:45

21              (Off the record.)

22              THE VIDEOGRAPHER:  We are back on the

23 record at 11:19 a.m.

24     Q.   BY MR. HILLER:  Okay.  There is something

25 here about Sean and Christine.  I think it's Le.    11:19:36

Rick Edmunds

1      A     It's kept in our cash office, our

2   bookkeeper's office.  It's maintained by our

3   bookkeeper.  We keep everything for three months.

4      **Q     Why three months?  Is that a written**

5   **policy somewhere?**

6      A     I don't know if it's a policy.  That's

7   what we've always done.

8      **Q     And why the bookkeeper's office?  Is that**

9   **a written policy?**

10     A     Because most of the refunds come to the

11  customer service desk, which is right by the

12  bookkeeper's office up front there.  They handle the

13  customer returns and credits and adjustments, that

14  office there, yes.

15     **Q     Okay.  All right.  You have been very**

16  **patient with me, sir.  Thank you for your time.**

17     A     Sure.

18            MR. RIDDELL:  I have nothing further.

19            MS. BARBER:  Thank you, Mr. Edmunds.  You

20  can leave.

21            THE REPORTER:  Mr. Riddell, did you want

22  to order this transcript today?

23            MR. RIDDELL:  Yes, I do.  Thank you.

24            THE REPORTER:  Ms. Barber, did you want to

25  order a copy?

Rick Edmunds

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF OREGON

3                    Portland Division

4

5    NATHANIAL DAVIS JR.,

6          Plaintiff,

7      vs.                     Case No.  3:24-CV-00455

8    SAFEWAY, INC., a Delaware

9    Corporation,

10          Defendants.

11

12

13

14       VIDEOCONFERENCE DEPOSITION OF RICK EDMUNDS

15                    August 19, 2025

16

17

18    Be it remembered that, pursuant to Oregon Rules of

19    Civil Procedure, the videoconference deposition of

20    RICK EDMUNDS was taken before Deborah Fleischer,

21    CSR #20-0461, RPR, on Tuesday, August 19, 2025,

22    beginning at the hour of 9:07 A.M.; the witness

23    responding to questions by videoconference; the

24    questions being propounded and proceedings reported

25    remotely via videoconference.
```

Rick Edmunds

```
 1                       APPEARANCES
 2
 3    Appearing on behalf of the Plaintiff:
 4    SEAN J. RIDDELL (Appearing Remotely)
 5    Sean J. Riddell, P.C.
 6    2905 ne Broadway Street
 7    Portland, Oregon 97232
 8    sjr@seanjriddellpc.com
 9
10    Appearing on behalf of the Defendants:
11    ALISON BARBER (Appearing Remotely)
12    Hitt Hiller Monfils Williams LLP
13    411 SW Second Avenue, Suite 400
14    Portland, Oregon 97204
15    abarber@hittandhiller.com
16
17
18    ALSO PRESENT REMOTELY:
19         Jake Quain - Video technician
20
21
22
23
24
25
```

Rick Edmunds

```
 1        Q      All right.  Are you familiar with the
 2   Safeway e-mail on their website?
 3        A      Where it says contact us?  That one up
 4   there?
 5        Q      Yes, sir.
 6        A      I recognize the www.Safeway.com, but I
 7   have never seen inquiry contact us.  I don't know
 8   about that one there.
 9        Q      Have you ever received an e-mail from the
10   contact us forwarded to you?
11        A      On this particular thing, no, I have not.
12        Q      Have you ever received an e-mail from the
13   contact us forwarded to you?
14        A      No.
15        Q      Do you know where the e-mail contact us
16   goes to?
17        A      I do not.
18               MR. RIDDELL:  I'm going to go off the
19   record here for a second.  I'll be right back.
20               (Brief break.)
21   BY MR. RIDDELL:
22        Q      Sir, returning to preserving evidence on
23   an incident, when you have an incident in your store,
24   do you go and review the video of the incident?
25        A      Would you say that again, please.
```

**Rick Edmunds**

```
 1        Q     When reviewing an incident in your
 2   store --
 3        A     Right.
 4        Q     -- do you review any surveillance video?
 5        A     Yes, I know how to do that.  I've done it,
 6   yes.
 7        Q     And is that a standard practice for
 8   Safeway employees?
 9        A     Yes, it is.  I don't know about Safeway
10   employees, but management -- anybody that has access
11   to the store director's computer, yes.  They can do
12   that.
13        Q     Now in doing that if you see any Safeway
14   employees taking notes of the incident, do you go and
15   get those notes?
16        A     Any notes?  I've never come across that
17   before where somebody is taking notes on the video.
18        Q     All right.  Returning for a second, do you
19   know what a receipt log is?
20        A     I do not.
21        Q     Do you know what a loss log is?
22        A     A loss log.  A loss log.  No, I do not.
23        Q     How about a return log?
24        A     We have --
25              MS. BARBER:  Just a minute.  Mr. Edmunds,
```

Rick Edmunds

```
 1  before you answer, I'm objecting to the extent this
 2  testimony exceeds his designation as a corporate
 3  representative.  He can testify as a fact witness but
 4  not as a corporate witness.
 5  BY MR. RIDDELL:
 6      Q    Do you know what a return log is?
 7      A    We have a return log, yes, for our store.
 8  It's something that we have when people bring things
 9  back, yes.
10      Q    Can you explain to me what a return log
11  is?
12      A    When somebody brings something back to the
13  store, we have them show us the receipt, and then we
14  do a refund if they need the refund, and then we log
15  it, and we keep it on file.
16      Q    How do you maintain the return log?
17      A    We have --
18           MS. BARBER:  This is a standing objection
19  so I don't continue to log the same objection.  The
20  objection that it exceeds your corporation designation
21  is a standing position.
22           You can answer.
23  BY MR. RIDDELL:
24      Q    How do you preserve the return log in your
25  store?
```

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3    NATHANIAL DAVIS JR.,            )
                                     )
4                   Plaintiff,       )
                                     )
5         v.                         )   Case No.
                                     )   3:24-cv-00455
6    SAFEWAY, INC., a Delaware       )
     corporation,                    )
7                                    )
                    Defendant.       )
8

9

10          DEPOSITION OF CHRISTOPHER GRAIL

11            Taken on Behalf of Plaintiff

12                    * * *

13

14        BE IT REMEMBERED THAT, pursuant to the Federal

15   Rules of Civil Procedure, the deposition of

16   Christopher Grail, was taken before Bailey K.

17   Fierling, a Certified Shorthand Reporter, on

18   Tuesday, the 19th day of November, 2024, commencing

19   at the hour of 11:11 a.m., in the law offices of

20   Hitt Hiller Monfils Williams, 411 SW 2nd Ave, Suite

21   400, Portland, Oregon.

22                    * * *

23

24

25

```
 1                        APPEARANCES

 2


 3    ASHLEY CADOTTE LAW
            BY MS. ASHLEY CADOTTE
 4          2905 NE Broadway St
            Portland, OR 97232
 5          971-804-0898
            Ashley@ashleycadottelaw.com
 6          Attorney for Plaintiff;

 7    SEAN RIDDELL, ATTORNEY AT LAW
            BY MR. SEAN J. RIDDELL
 8          2905 NE Broadway St
            Portland, OR 97232
 9          971-219-8453
            sjr@seanjriddellpc.com
10          Attorney for Plaintiff;

11    HITT HILLER MONFILS WILLIAMS
            BY MR. JAMES L. HILLER
12          411 SW 2nd Ave,
            Suite 400
13          Portland, OR 97204
            503-228-8870
14          jhiller@hittandhiller.com
            Attorney for Defendant.

15

16

17

18

19

20

21

22

23

24

25
```

1   still there.

2        Q.   BY MS. CADOTTE:  He was still there?

3        A.   Almost definitely.  Yes.

4        Q.   At any point in time were you aware if he

5   was suspended?                                          11:34:14

6        A.   Not that I know of.

7        Q.   Were there complaints made about him?

8        A.   Not that I know of.

9        Q.   Are you aware why he was terminated?

10       A.   I didn't ask.                                 11:34:22

11       Q.   Was he at work on duty on

12  January 11th, 2024?

13       A.   No.

14       Q.   And on this evening, do you recall a

15  gentleman, Mr. Davis, requesting assistance for a       11:34:42

16  return of items?

17       A.   Yes.

18       Q.   Can you please tell me about that

19  interaction.

20       A.   He walked up, wanted a refund.  And, okay,    11:34:49

21  I'll help you with your refund.  He gives me his

22  phone to look at.  And as soon as I'm about to go

23  help the gentlemen, Ashley walked up and said that

24  you've been trespassed from here and you're not

25  allowed here.  That's when I kind of backed away for     11:35:06

1  a minute and was -- well, what's -- I didn't know if

2  she was right or wrong.  He eventually said some

3  very vulgar things about -- I don't even know if I

4  want to say it.  But he said I don't look like every

5  effing Black man out there.  And that's when she          11:35:27

6  threw up her hands and went oh, you're playing the

7  race card.  And she walked back to a checkstand to

8  help bag and let me deal with the situation.  He was

9  pretty heated about that, of course, which I

10 totally -- is reasonable, I guess.  And then stopped      11:35:44

11 me from wanting to help him with the refund at all.

12         When I looked at his phone, I didn't

13 realize it was an Instacart deal in the first place.

14 I thought it was a Safeway receipt on his phone,

15 because the apps have that, as well.  I couldn't          11:35:59

16 understand why the prices were heightened, because

17 they were.  I even went through our ad list and went

18 through all the prices for him to see why and how

19 much were taken off.  And I even did the math of how

20 much I should probably give him.  I even looked in       11:36:16

21 the books for refunds to see if there was any

22 communication, because he had told me that Isaiah

23 was -- my boss said that he was allowed a refund.

24         Usually, something is written in the book

25 about that kind of stuff, and I saw nothing in           11:36:32

1    there.  Still didn't try to stop me from helping him

2    try to find out the problem to why these prices were

3    heightened and why he was charged so much.  Little

4    did I know, later, that it was because it was by a

5    third party app, which he -- didn't seem like he          11:36:48

6    knew that information for some reason, why the

7    prices were heightened.  When you do delivery like

8    that, that's just what happens.

9              So in any case, I kept telling him

10   repeatedly that you should talk to my other manager    11:37:04

11   about this.  Talk to my other manager about this

12   when she's here.  I can even give you her phone

13   number, if you like.  And he just did not like that

14   answer, so.  And that's all I could do for him at

15   that point.                                             11:37:16

16        Q.   Okay.  So I believe you stated your

17   initial interaction is when Ms. Cutlip came over and

18   had said that he was trespassed.  Is that accurate?

19        A.   Yeah.

20        Q.   Okay.  What do you recall from that          11:37:35

21   interaction with Ms. Cutlip, Mr. Davis?

22        A.   Honestly, the only thing that really

23   perked my interest was because I was trying to focus

24   on reading through the refunds.  I just hear him

25   start yelling I'm not like every effing Black man.      11:37:49

1        A.    I'd already said that to him.

2        Q.    Okay.  Okay.  So go ahead and let me know

3    when you're saying it and I'll pause it.

4        A.    I'm pretty sure you already passed it.  I

5    think it was when I raised my hand and looked at          12:11:33

6    him.  I don't think he was even looking when I said

7    it.

8        Q.    So did he respond to you when you said

9    that?

10       A.    No.  I thought he was just mad.  I spent        12:11:45

11   about 15 minutes trying to find out how I can help

12   this guy.

13       Q.    And was Mr. Davis making any further

14   statements about how he felt about Ms. Cutlip's

15   accusations of being trespassed and playing the race     12:12:13

16   card?

17       A.    I know he was starting to yell at me about

18   it a little bit.  Yes.

19       Q.    And when you say starting to yell, what

20   was he saying?                                            12:12:23

21       A.    I can't quite remember the specifics, to

22   be honest.

23       Q.    Do you know generally?

24       A.    Hm-mh.

25       Q.    Okay.  Was he asking if you could provide       12:12:31

1   a photograph of this man that he's being mistaken

2   for?

3       A.   I can't say.

4       Q.   Do you recall him ever asking that?

5       A.   Yes.  Yes.                              12:12:43

6       Q.   And what was your response?

7       A.   No.  I didn't even know anything about

8   that situation.  How would I know if there was a

9   photograph?

10      Q.   Is that what you said?                   12:12:56

11      A.   No.

12      Q.   You just said no?

13      A.   Yeah.

14      Q.   With no explanation?

15      A.   Yeah.                                    12:13:02

16      Q.   So Mr. Davis has just been accused of

17  being trespassed and using the race card, and he's

18  asking for proof as to who this man is, because it's

19  not him, and nobody is following up on this; is that

20  correct?                                          12:13:24

21      A.   I had no one to even ask about it.  All

22  the managers I needed to talk to were gone.  I was

23  the only one in charge.  I had no means to be able

24  to do that.  I didn't have access to some of the

25  equipment I would need, like the cameras or whatnot, 12:13:42

1   to be able to even check that form.  Only upper

2   management has access to stuff like that, which most

3   things that are serious like this go to them.

4        Q.   Did you make any type of note about this

5   interaction that was left for the morning managers       12:14:03

6   to come in and be aware of?

7        A.   No.

8        Q.   And --

9        A.   I wanted to be able to leave it in person.

10  I don't have anywhere safe I can leave sensitive          12:14:14

11  information like that for the boss to see, except on

12  the front door, which every associate that walks by

13  would be able to see that, and I have to be able to

14  at least respect the privacy of such a situation.

15       Q.   And whose privacy were you wanting to          12:14:28

16  ensure was protected?

17       A.   The customer and the employees.  That's

18  even in our handbook.

19       Q.   So right now it appears at approximately

20  5:44:29 you are typing on your phone; is that            12:14:42

21  correct?

22       A.   That's when I was calling my boss.  Yes.

23       Q.   Okay.  And we show in the video Ms. Cutlip

24  returning to the customer service desk.  Do you

25  recall that occurring?                                    12:14:58

1        A.   Yes.  I'm just trying to understand why

2    they're heightened in the first place, and I have no

3    means of finding out how or why.

4        Q.   Well, you would agree you could ask

5    Mr. Davis, right, how you purchased it?              12:20:41

6        A.   Yeah.  But he was the one asking me why

7    the prices were heightened.  Usually people that use

8    third party apps do know that there is fees and

9    taxes that come along with it.

10       Q.   And is this the book, again, you're       12:21:02

11   looking for notes in?

12       A.   Yeah.  I think he kept repeating that he

13   was told that he could get a refund.

14       Q.   And can you explain this book to me a

15   little bit more?                                     12:21:15

16       A.   And I just kept trying to -- yeah.  It's a

17   refund book and we put information in it.  Let's say

18   if somebody was to need a refund somewhere or some

19   time, and they're not able to communicate it, that's

20   usually the book you'd put it in.                    12:21:27

21       Q.   Okay.

22       A.   And even though I didn't see it in there,

23   I did still try to help the gentleman with the

24   refund.

25       Q.   How did you try to help him?               12:21:35

 1        A.   By trying to find out why these prices

 2   were heightened in the first place.

 3        Q.   And what are you writing down there?

 4        A.   I don't remember.

 5        Q.   Well, that's in the notebook regarding          12:21:54

 6   returns; correct?

 7        A.   That I may have left a note about it,

 8   actually.  I've had to look.  I don't remember.

 9        Q.   So at 5:48:10, you're leaving a note in

10   the book that's used for returns; is that accurate?       12:22:22

11        A.   Yes.

12        Q.   But you don't have a recollection as to

13   what you were writing down?

14        A.   I don't remember.  It's been about a year

15   now.                                                      12:22:32

16        Q.   Would it be in relation to this

17   interaction?

18        A.   I would imagine.  Yes.

19        Q.   Can you hear what Mr. Davis is saying on

20   his phone?                                                12:22:43

21        A.   No.

22        Q.   Okay.

23        A.   This is when I kept telling him that

24   I -- you need to speak to my other manager tomorrow.

25   Can I give you her number?  You need to speak to my       12:23:11

```
 1   media accounts?

 2        A.    Facebook.

 3        Q.    Are you very active on Facebook?

 4        A.    Not lately.

 5        Q.    Do you follow accounts on Facebook that      12:32:05

 6   interest you?

 7        A.    What do you mean?

 8        Q.    Like, follow accounts that interest you,

 9   their postings, so that they pop up on your feed?

10        A.    Well, yeah.                                  12:32:21

11        Q.    Are they accounts that you generally are

12   interested in and that you can relate to?

13        A.    I guess you could say that.  Yes.

14        Q.    Do you follow an account by the name of

15   American Straight White Male?                           12:32:38

16        A.    I don't know.

17        Q.    Are you aware of all the accounts that you

18   follow?

19        A.    No.

20        Q.    You would agree that in order to follow an   12:32:47

21   account, you have to proactively click a button that

22   says follow?

23        A.    Yeah.

24        Q.    And then that would allow you to get

25   notifications of the content that they post; is that    12:33:00
```

1   correct?

2        A.   Yeah.

3        Q.   So what's my last exhibit?  3.  Showing

4   you what's been marked as Exhibit 4.  One moment.

5             (Exhibit No. 4 marked.)                    12:33:15

6        Q.   BY MS. CADOTTE:  Do you recognize this?

7             MR. HILLER:  At this point, I want to

8   take a break, when I get the chance, to look at

9   this.

10            (Off the record from 12:33 to 12:36 pm)     12:36:39

11       Q.   BY MS. CADOTTE:  Mr. Grail, looking at

12   Exhibit 4, do you recognize that?

13       A.   No.  I have over 5,000 feeds that I

14   follow, so most are just funny videos at times.  You

15   don't even really get to see who's posting them.  If  12:36:51

16   you like the video, say it's something funny, you

17   would follow it.

18       Q.   So my question was do you recognize

19   Exhibit 4?

20       A.   No.                                         12:37:04

21       Q.   You do not recognize your Facebook

22   profile?

23       A.   Well, yes, I do.  Yes.  Sorry.

24       Q.   So is Exhibit 4 --

25            MR. HILLER:  Let her answer the            12:37:11

1    question.

2         Q.   BY MS. CADOTTE:   So is Exhibit 4 your

3    Facebook profile?

4         A.   Yes.

5         Q.   And below that does it identify who you're      12:37:17

6    following?

7         A.   Yes.

8         Q.   Okay.   And it does say you do follow

9    4.9 thousand people or profiles.   And one of those

10   is the American Straight White Male; correct?          12:37:32

11        A.   Yes.

12        Q.   And you previously testified that the

13   profiles you follow are ones that interest you or

14   you relate to.   Is that still true?

15        A.   Yes.                                          12:37:48

16        Q.   Okay.   So what about --

17        A.   I don't know what that is, though.

18        Q.   Can I please finish my question.   What

19   about this one would interest you or do you relate

20   with?                                                  12:38:00

21        A.   I don't know what that one is.

22        Q.   Okay.   Showing you what's been marked as

23   Exhibit 5.

24              (Exhibit No. 5 marked.)

25        Q.   BY MS. CADOTTE:   Is Exhibit 5 a Facebook      12:38:20

1  post by the American Straight White Male?

2              MR. HILLER:  Do you know?

3      A.   I've never seen this before.

4              MR. HILLER:  Listen to the question.

5              THE WITNESS:  I'm sorry.                12:38:44

6              MR. HILLER:  What is the answer?

7              What was your question again?

8              MS. CADOTTE:  Is Exhibit 5 a Facebook

9  post by the American Straight White Male?

10             MR. HILLER:  Do you know the answer    12:38:54

11 to that question?

12     A.   Yes.

13     Q.   BY MS. CADOTTE:  Okay.  Have you ever seen

14 that meme before?

15     A.   No.                                       12:39:03

16     Q.   Do you have any idea what that meme

17 represents?

18     A.   Not exactly.

19     Q.   Is it a meme showing a chart of

20 interracial violent crime incidents?                12:39:18

21     A.   2018.  Yes.

22     Q.   Okay.  And is it showing that Black people

23 commit violent crimes against White people at a

24 significantly higher rate than White people

25 committing crimes on Black or African American?    12:39:32

 1      A.    That's what it looks like.  Yes.  The

 2   bottom is kind of funny.  It's --

 3              MR. HILLER:  I'm sorry, say again.

 4      A.    Well, it says odd, why would the media

 5   misrepresent the real situation to an extreme          12:39:52

 6   degree.

 7              MR. HILLER:  But --

 8      Q.    BY MS. CADOTTE:  Do you understand what

 9   that means?

10      A.    No.  Again, I've never even --              12:39:58

11              MR. HILLER:  Answer.  Do you know

12   what it means?  Answer.

13      A.    No.  No.

14              MR. HILLER:  Thank you.

15      Q.    BY MS. CADOTTE:  But does this chart and     12:40:08

16   meme indicate that White people are victims of Black

17   people?

18      A.    That's what it says.  Yes.

19      Q.    Do you agree with that?

20      A.    No.                                          12:40:19

21      Q.    Okay.  But that's a profile that you

22   follow?

23      A.    Looks like it.  Yes.

24      Q.    Handing you what's been marked as

25   Exhibit 6.                                            12:40:31

```
 1                    (Exhibit No. 6 marked.)

 2          Q.   BY MS. CADOTTE:  Do you recognize that?

 3          A.   No.

 4          Q.   I'm sorry, are you laughing?  I couldn't

 5     tell.                                              12:40:47

 6          A.   No.

 7          Q.   Is that a post made by the American

 8     Straight White Male?

 9          A.   Yes.

10          Q.   And these are posts -- can you read the   12:40:53

11     date on which they were posted, please.

12          A.   July 13th.

13          Q.   And can you read what this post says,

14     please.

15          A.   White privilege is a myth perpetuated by  12:41:12

16     those who hate White people.

17          Q.   What is your understanding of white

18     privilege?

19          A.   I don't know.

20          Q.   Have you ever heard that it's a term used 12:41:26

21     in regards to the social advantages that White

22     people have over none-White people?

23          A.   I don't know.

24          Q.   Have you ever heard that term before?

25          A.   No.  Just from you.                       12:41:44
```

**Joshua Hilfiker**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF OREGON

 3                       Portland Division

 4

 5   NATHANIAL DAVIS JR.,

 6            Plaintiff,

 7      vs.                        Case No. 3:24-CV-00455

 8   SAFEWAY, INC., a Delware

 9   Corporation,

10            Defendants.

11

12

13

14      VIDEOCONFERENCE DEPOSITION OF JOSHUA HILFIKER

15                      May 14, 2025

16

17

18   Be it remembered that, pursuant to Oregon Rules of

19   Civil Procedure, the videoconference deposition of

20   JOSHUA HILFIKER was taken before Deborah Fleischer,

21   CSR #20-0461, RPR, on Wednesday, May 14, 2025,

22   beginning at the hour of 9:00 A.M.; the witness

23   responding to questions by videoconference; the

24   questions being propounded and proceedings reported

25   remotely via videoconference.
```

Joshua Hilfiker

```
 1                         APPEARANCES

 2

 3    Appearing on behalf of the Plaintiff:

 4    ALISON BARBER (Appearing Remotely)

 5    Hitt Hiller Monfils Williams LLP

 6    411 SW Second Avenue, Suite 400

 7    Portland, Oregon 97204

 8    abarber@hittandhiller.com

 9

10    Appearing on behalf of the Defendants:

11    SEAN J. RIDDELL (Appearing Remotely)

12    Sean J. Riddell, P.C.

13    2905 NE Broadway Street

14    Portland, Oregon 97232

15    sjr@seanjriddellpc.com

16

17

18    ALSO PRESENT REMOTELY:

19         Stephanie Spear - Video technician

20

21

22

23

24

25
```

Joshua Hilfiker

1      Q      And do you remember the last year you did
2  it?
3      A      No, sir.
4      Q      But you did it definitely when you got
5  hired in 2014?
6      A      Yes, sir.
7      Q      All right.  Do you know if you did it in
8  2023?
9      A      I do not believe so, sir.
10     Q      Why don't you believe so?
11     A      I don't remember taking the module.  I
12  take modules all the time.  I don't know exactly when
13  I look every module I've done.
14     Q      Can you explain to me the process or if
15  there is one -- let's start there.  Is there a process
16  by which a customer can be trespassed from the
17  defendants store?
18     A      Yes.  Loss prevention does formal
19  trespassing.  There are on occasions where a store
20  director or assistant store director will do a verbal
21  trespass.  But all legal documented trespasses are
22  done through loss prevention.
23     Q      So tell me because you used the phrase
24  formal, and you used the phrase legal to describe the
25  trespassing that loss prevention is.  Can you explain

**Joshua Hilfiker**

1    **to me what you mean by formal and legal trespass by**
2    **loss prevention, please?**
3         A    So a documented trespass on paper with the
4    subject's information we consider a legal trespass.
5    It means we can enforce it with law enforcement.  A
6    verbal trespass is nonformal, and we cannot legally
7    enforce it with law enforcement.
8         **Q    All right.  So is there a form?**
9         A    Yes.
10         **Q    Does a store employee have the authority**
11    **to fill out the trespass form and hand it to a**
12    **customer to trespass them from defendants property?**
13         A    There are two store employees inside of a
14    store that are allowed to do that, the store director
15    and assistant store director.
16              MR. RIDDELL:  Ms. Debbie, did you hear
17    that last part?
18              THE REPORTER:  Yes.  He said the store
19    director and assistant store director.
20    BY MR. RIDDELL:
21         **Q    All right.  Thank you.  I just didn't hear**
22    **that last part.  I apologize.  Okay, sir.  And the**
23    **store director and assistant store director, and then**
24    **how about a loss prevention officer?  Are they allowed**
25    **to do that?**

Joshua Hilfiker

```
 1        A    No.
 2        Q    How often is an asset protection
 3   specialist supposed to look at Aura for trespasses?
 4        A    We don't search them out.  We -- if we
 5   apprehend someone, we will look their name up because
 6   it will -- we can search by name, and we will look to
 7   see if there's any prior instances with that person.
 8        Q    Okay.  Just so I understand correctly, an
 9   asset protection specialist when they show up for work
10   is not required to go look in Aura and see who are the
11   new people that have been trespassed since their last
12   shift; is that correct?
13        A    Correct.
14        Q    That an asset protection specialist for
15   the defendant looks in Aura after they've apprehended
16   someone to see if they've been previously trespassed;
17   is that correct?
18        A    In most instances, yes.
19        Q    And am I also correct in assuming that,
20   say, in the break room or the employee room that there
21   isn't a group of photos of people that have been
22   trespassed from each store so other employees know who
23   has been trespassed?
24        A    Absolutely not.  We don't post pictures
25   anywhere.
```

Joshua Hilfiker

```
 1          Q      You said absolutely not.  Is that like --
 2    is there, like, a reason why you don't post that?
 3          A      Company policy.  Privacy.
 4          Q      Okay.  It's a privacy policy.  Got it.
 5    Are you familiar at all with the plaintiff
 6    Nathanial Davis's interaction with the defendant in
 7    January of 2024?
 8          A      No, sir.
 9          Q      Give me one second.  So let's talk
10    about -- specifically about the Safeway location at
11    2836 Pacific Avenue, Forest Grove.  Have you ever been
12    there?
13          A      Yes, sir.
14          Q      How often?
15          A      Every other week.  Every couple weeks
16    depending on my case load.
17          Q      Do you have a certain number of stores
18    you're assigned to supervise?
19          A      Nineteen.
20          Q      And this is one of your nineteen stores?
21          A      Correct.
22          Q      The one -- just so the record is correct,
23    2836 Pacific Avenue, Forest Grove?
24          A      Correct.
25          Q      There's been some testimony there wasn't
```

Joshua Hilfiker

```
 1        A     Correct.
 2        Q     All right.  So as of January 2024 you
 3   didn't have the personnel to have an asset protection
 4   person at this particular store or there wasn't a need
 5   or both?
 6        A     Both.
 7        Q     And why -- how do you define need for a
 8   particular store?
 9        A     To be honest, sir, it's above my pay
10   grade.  My division president makes those decisions.
11   I only request bodies.  I can't decide when they get
12   picked.
13        Q     Okay.  So as of January 2024 if you had
14   the personnel, would you have an asset protection
15   person at this particular store?
16        A     If I only have one person, no, sir.  I
17   have stores that require much more than that store.
18        Q     Okay.  So this store doesn't particularly
19   -- this store in Forest Grove doesn't have a
20   particular need for an asset protection specialist?
21        A     At this point, no.
22        Q     And at this point you mean January 2024?
23        A     Correct.
24        Q     Give me one second.  Now returning to the
25   Forest Grove location, if this Forest Grove location
```

Joshua Hilfiker

1  is not assigned an asset protection specialist, do the
2  store employees get additional training on asset
3  protection that other stores wouldn't get?
4      A    They go through a training module just
5  like everyone else within the company when you're
6  first hired that our policy is customer service,
7  customer service, customer service.  There are only
8  two people in the store allowed to make an
9  apprehension or confront a shoplifter or someone they
10 suspect shoplifting.  That is a store director and
11 assistant store director.
12     Q    Okay.  What about returns?  Can an
13 employee deny a return?
14     A    There are certain employees that can deny
15 returns, yes.
16     Q    Can an employee deny a return if they
17 believe the return is fraudulent?
18     A    If they believe the return is fraudulent,
19 yes.
20     Q    Is there a criteria by which they're
21 supposed to follow to determine if it's fraudulent?
22     A    That's a store policy decision I'm not
23 familiar with.
24     Q    And just to be clear, any employee can
25 deny a return if they think it's fraudulent?

**30(B)(6) Safeway, Inc.**

```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE COUNTY OF OREGON

3                    PORTLAND DIVISION

4

5    NATHANIAL DAVIS JR.,

6            Plaintiff,

7      v.                              No. 3:24-cv-00455

8    SAFEWAY, INC., a Delaware

9    Corporation,

10           Defendant.

11

12

13        VIDEOCONFERENCE 30(B)(6) DEPOSITION OF

14                  SAFEWAY, INC.

15            DESIGNEE SHENA WHEELER

16           Taken in behalf of Plaintiff

17                 October 7, 2025

18

19

20   BE IT REMEMBERED THAT, pursuant to the Civil Rules

21   of Procedure, the deposition of SAFEWAY, INC.

22   DESIGNEE SHENA WHEELER, was taken before Shannon K.

23   Krska, CSR, on October 7, 2025, commencing at the

24   hour of 9:02 am; the proceedings being reported via

25   Zoom.
```

30(B)(6) Safeway, Inc.

```
 1                         APPEARANCES

 2

 3    Appearing on behalf of the Plaintiff:

 4    MR. SEAN J. RIDDELL (appearing remotely)

 5    Sean J. Riddell, P.C.

 6    2905 N.E. Broadway Street

 7    Portland, OR 97232

 8    971.219.8453

 9    sjr@seanjriddellpc.com

10

11    MS. ASHLEY R. CADOTTE (appearing remotely)

12    Ashley Cadotte Law, LLC

13    2905 N.E. Broadway Street

14    Portland, OR 97232

15    971.804.0898

16    ashley@ashleycodettelaw.com

17

18

19

20

21

22

23

24

25
```

30(B)(6) Safeway, Inc.

 1    for any emails relevant to this incident in the
 2    past year?
 3        A.   No.  I haven't been in that store since
 4    December of last year, so no, I have not.
 5        Q.   December of 2024?
 6        A.   Correct.
 7        Q.   And do you remember searching your Safeway
 8    and we'll call it Wheeler account, is it okay if we
 9    call it that?
10        A.   Yes.
11        Q.   Okay.  Do you remember searching your
12    Wheeler account for any emails relevant to this
13    incident in the last year and a half?
14        A.   I do not recall, no.
15        Q.   Okay.  Now, returning to -- returning to
16    this particular incident, let's talk about January
17    of 2024.  How were you employed?
18        A.   I was the store director at Forest Grove
19    Safeway.
20        Q.   How long have you, in January of 2024, been
21    employed by Safeway?
22        A.   That would have been 22 years.
23        Q.   Oh, wow.  Look at that.
24             Just out of curiosity, what were you first
25    hired as?

30(B)(6) Safeway, Inc.

1        Q.   All right.  Ms. -- Ms. Barber's objection
2    is noted, for the record.
3             Number 9, Safeway's policies on the
4    maintenance, purpose, and retention of refund logs;
5    are you prepared to testify about that?
6        A.   Yes.
7        Q.   Number 10, "Safeway's reception of a
8    preservation letter from Ashley Cadotte Law dated
9    January 13th, 2024, attached and marked as
10   Exhibit 1"; are you prepared to answer questions
11   about Number 10?
12       A.   Yes.
13       Q.   Number 11, "What actions Safeway did or did
14   not take to preserve relevant documents upon
15   reception of Exhibit 1," the preservation letter
16   dated January 11th, 2024; are you prepared to
17   answer questions about that?
18       A.   Yes.
19       Q.   And Number 12, "Safeway's reception of an
20   email from Ashley Cadotte Law to Safeway dated
21   January 16th, 2024, attached ... as Exhibit 2"; are
22   you prepared to answer questions about that?
23       A.   Can I see what Exhibit 2 is?
24       Q.   Yes, ma'am.  Let me see if I can pull that
25   up here, hold on.

30(B)(6) Safeway, Inc.

1    A.   Yes.

2    Q.   Hold on one second.  Let me blow it up so

3  you can see it.

4         (Deposition Exhibit Number 2 premarked for

5          identification.)

6    Q.   (By Mr. Riddell)  Are you prepared to

7  answer questions about Exhibit 2, the email?

8    A.   Yes.

9    Q.   Okay, all right.

10         Okay.  Turn to -- and Number 13, "What

11  actions Safeway did or did not take to preserve

12  relevant documents and evidence upon reception of"

13  the email; are you prepared to testify about that?

14    A.   Yes.

15    Q.   All right.  Wonderful.

16         So we're now moving to what's marked as

17  Exhibit 1 which is the preservation letter sent

18  from Ms. Cadotte on January 13th, 2024.

19         Do you remember receiving this email?

20         MS. BARBER:  You mean letter?

21         MR. RIDDELL:  Yes, sorry.

22         THE WITNESS:  I was going to say, I did not

23  receive an email from that, but letter, yes.

24         (Deposition Exhibit Number 1 premarked for

25          identification.)

30(B)(6) Safeway, Inc.

```
 1       Q.   (By Mr. Riddell)  Okay.  So you received
 2   Exhibit 1.
 3            Do you need me to scroll through it?
 4       A.   Yes.
 5       Q.   All right.  And I'm done scrolling.
 6            Do you remember receiving Exhibit 1?
 7       A.   Yes.
 8       Q.   What actions did you take to preserve
 9   relevant evidence after receiving Exhibit 1?
10       A.   I re -- I obtained my employees'
11   statements.  I then emailed their statements with
12   this letter to my upper management, my HR, and LP
13   who would secure videotape.  And those were the
14   only documentations I had to send.
15       Q.   What do you mean only documentations you
16   had to send?  What does that mean?
17       A.   I took my employees' statements and I sent
18   them up with that email.
19       Q.   Who is them?  Who's --
20       A.   Ashley Cutlip and, sorry, Chris.  I
21   couldn't tell you Chris' last name because I have
22   not been there for a while.
23       Q.   Okay.  Was -- was Chris the gentleman
24   that --
25       A.   Chris Grail, yes.
```

30(B)(6) Safeway, Inc.

1        Q.    Was Mr. Grail the gentleman who dealt with
2    Mr. Davis?
3        A.    Yes.
4        Q.    Okay.  What is a return log?
5        A.    We don't have a return log or a policy, so
6    I couldn't tell you.  I could make my guess at what
7    a return log would be.
8            MS. BARBER:  Just to clarify the record,
9    are you referring to the refund log on topic 9 or
10   are you -- is that what you're referring to?
11       Q.    (By Mr. Riddell)  How about a refund log?
12   Do you have a refund log?
13       A.    I do not.
14       Q.    And not you.  Does Safeway have a refund
15   log?
16       A.    No, we do not.
17       Q.    Did the Forest Grove office have a refund
18   log, Forest Grove -- sorry, Forest Grove store, did
19   they have a refund log?
20       A.    We did not.
21       Q.    All right.  If Mr. Grail testified to --
22   that there was a refund log, would he be telling
23   the truth?
24       A.    He would not.
25       Q.    If Mr. Grail testified that he took notes

30(B)(6) Safeway, Inc.

1  in the refund log, would he be telling the truth?

2      A.    There was no refund log to take notes in.

3      Q.    If a video shows Mr. Grail taking notes in

4  a refund log, would there be a refund log?

5      A.    There was no refund log, so no.

6      Q.    Did you take any efforts to preserve a

7  refund log?

8      A.    There was no refund log.

9      Q.    Tell me how someone does -- in the Forest

10  Grove -- in January of 2024, tell me how a customer

11  would return or refund an item to the Forest Grove

12  store.

13      A.    They would come in with their receipt from

14  the store with whatever their issue is and bring it

15  to customer service and we would take care of it at

16  the time.

17      Q.    All right.  Is there -- what -- did you

18  ever work on the desk and do refunds at the Forest

19  Grove office in 2024?

20      A.    I'm sure I did.

21      Q.    All right.  And when doing refunds, there

22  was no notebook there that you kept notes on?

23      A.    No, there's no refund log.

24      Q.    So then just so the record is clear.  Since

25  your testimony is there is no refund log, when